**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO**

---

**UNITED STATES OF AMERICA,**

      **Plaintiff,**

**v.**                                                                  **NO. CR 03-218  JC**

**LUZ MARIA VALENZUELA,**

      **Defendant.**

## MEMORANDUM OPINION AND ORDER

On March 14, 2003, Defendant Luz Maria Valenzuela filed a Motion to Suppress Stop, Statements and Physical Evidence (Doc. No. 37). Defendant argues that statements she made to border patrol agents after her November 21, 2002 arrest cannot be used as evidence in her criminal trial because they were made after an illegal stop and arrest. On July 2, 2003, the Court held a hearing on Defendant's motion. At the hearing, the Court found that Defendant Valenzuela was arrested roadside at the time handcuffs were placed on her and she voluntarily consented to go to the station with Agent Richard Huerta. By request of the Court, the parties submitted post hearing briefs on the issue of whether there was probable cause to arrest Defendant Valenzuela at the point when she voluntarily consented to go to the border patrol station with Agent Huerta. Having considered the briefs and the evidence in the record, the Court concludes that Defendant's motion should be granted.

I.      **Factual Findings**

On November 21, 2002, at around 9:00 a.m., Agent Eugene Lewis, a supervisory border patrol agent, was driving southbound on New Mexico State Highway 11. Agent Lewis has worked with the border patrol for 15 years and has lived in the Deming, New Mexico area for the past five years. Agent Lewis is familiar with the local traffic, which is lighter than usual around 9:00 a.m. to 10:00 a.m. Agent Lewis has been involved in over 100 roving border patrol stops.

At mile marker 28, Agent Lewis observed a white Chevrolet pickup truck with an American flag displayed on the hood and an American flag screen on the rear window. The truck was driving northbound on Highway 11 and bore an Arizona license plate. Agent Lewis also noticed a maroon Cadillac with an Arizona license plate two vehicles behind the truck. The truck and Cadillac aroused Agent Lewis' suspicions because of several recent alien smuggling cases involving Arizona vehicles, so Agent Lewis turned around and traveled northbound on Highway 11 to get a closer look at the two vehicles. At the point when Agent Lewis first observed the two vehicles, he was about four miles south of Deming, New Mexico, and 28 miles north of the Mexican border. Highway 11 is the main route for northbound traffic going through Deming to Interstate 10.

As Agent Lewis passed the Cadillac, the driver of the Cadillac slowed down so that he was now further behind the white truck. Agent Lewis noticed that the Cadillac had a fine layer of dust on it, indicating to Agent Lewis that it had recently been driven on a dirt road. Agent Lewis requested a vehicle registration, stolen vehicle, and 72-hour lane check of the Cadillac. The 72-hour lane check revealed that the Cadillac had not crossed into the United States from Mexico recently. The registration check showed that the owner of the Cadillac was a female, but Agent

Lewis had seen that the driver of the Cadillac was a male. Agent Lewis observed that there was something odd about the bumper holding the trim in place. As Agent Lewis passed the Cadillac, the driver looked straight ahead, not looking at the agent or otherwise acknowledging the agent's presence. The driver gripped the wheel tightly. Agent Lewis noticed that the vehicle appeared to be weighed down in the rear end due to a noticeable space between the front tires and the front wheel well and the lack of space between the rear tires and rear wheel well.

Agent Lewis passed the Cadillac and two vehicles that were between the Cadillac and the white truck. Agent Lewis then passed the white truck. At first he believed that the driver, and sole occupant of the white truck, was male due to the person's appearance. The driver, who was later determined to be a woman, had her left hand against the left side of her face, with her elbow resting on the left windowsill of the truck. The white truck did not have the same dust on it that Agent Lewis had seen on the Cadillac. Agent Lewis passed the white truck and continued driving north into Deming.

When Agent Lewis arrived in Deming, he pulled over to the side of Highway 11 briefly to get a second look at the Cadillac. As the Cadillac passed, Agent Lewis noticed for a second time that the Cadillac appeared to be weighted down in the back. Agent Lewis radioed Agent Richard Huerta to assist in stopping the Cadillac. Agent Lewis then pulled back onto Highway 11 to follow the Cadillac, but was unable to get directly behind it because of traffic.

In Deming, Highway 11 turns into Columbus Road and then into Gold Avenue. Agent Lewis next saw the white truck and the Cadillac when the two vehicles were near the intersection of Ash and Gold. The white truck was ahead of the Cadillac. The white truck and the Cadillac continued north through a green stoplight at the intersection of Ash and Gold. The two vehicles

then proceeded through a green light at the intersection of Spruce and Gold.  At the intersection of Gold and Pine, Agent Lewis noticed that the Cadillac was directly behind the white truck.  Both the white truck and the Cadillac proceeded north through that intersection.  After Pine Street, Highway 11 passes underneath Interstate 10.  After the white truck and Cadillac cleared the intersection at Gold and Pine, Agent Lewis lost sight of the vehicles.  In total, the two vehicles went through two stop signs and three stoplights from the point Agent Lewis first observed them on Highway 11 to where they entered Interstate 10.  Agent Lewis followed the two vehicles on Highway 11 for approximately seven miles.

Because both vehicles had Arizona license plates, Agent Lewis suspected that they were driving in tandem and would turn onto westbound Interstate 10.  Agent Lewis entered Interstate 10, traveling westbound.  Near mile marker 79, about eight miles from the intersection of Highway 11 and Interstate 10, Agent Lewis spotted the Cadillac in the distance as it was changing lanes and passing other vehicles.  Agent Lewis sped up, and as he approached the Cadillac, he observed that the white truck was in the right lane about a quarter of a mile behind the Cadillac.  A number of tractor trailer rigs and other vehicles were on Interstate 10 between the Cadillac and the white truck.  Agent Lewis passed the white truck, caught up to the Cadillac near mile marker 69, and pulled in behind the Cadillac.  The Cadillac, which was traveling about 80 miles per hour, then slowed down to about 60 miles per hour.  The posted speed limit at that point was 75 miles per hour.

The white truck then passed Agent Lewis and the Cadillac, at which point Agent Lewis radioed Agent Huerta and told him to look for the truck and gave him the truck's license plate number.  Agent Lewis activated his emergency equipment and stopped the Cadillac near mile

marker 66. Agent Lewis approached the driver, later identified as Julio Armando Reynaga Cortez, and questioned him about his citizenship. Mr. Reynaga did not respond and acted confused. However, Mr. Reynaga finally said that he was from Mexico, and in response to Agent Lewis' request, produced two Republic of Mexico passports. Mr. Reynaga was visibly nervous and unable to locate the Visas in the passports. Agent Lewis then asked to see what was in the trunk. Mr. Reynaga asked why he wanted to know. Upon Agent Lewis' repeated request, Mr. Reynaga opened the trunk. Inside the trunk were bundles of marijuana. At the roadside, Mr. Reynaga did not indicate in any way that he was traveling with the white truck.

Agent Lewis then radioed Agent Huerta, informed Agent Huerta that marijuana had been found in the Cadillac and that the white truck and Cadillac were traveling in tandem, and asked Agent Huerta to stop the white truck. Agent Huerta stopped the truck near mile marker 62 on Interstate 10. Agent Huerta asked the driver, later identified as Defendant Luz Maria Valenzuela, to accompany him to the Deming border patrol station. Defendant Valenzuela voluntarily consented to go to the Deming border patrol station. However, since no female agents were present to pat down Defendant for any weapons, an agent handcuffed Defendant and transported her to the station. Another agent drove Defendant's truck to the station. At the border patrol station, Agent Huerta advised Defendant of her *Miranda* rights and asked if she understood those rights. Defendant signed a border patrol form indicating her understanding and waiver of her *Miranda* rights. Agent Christine Britol questioned Defendant for about 40 to 45 minutes until Defendant invoked her right to an attorney. After Defendant invoked her right to an attorney, Agent Britol did not ask any more questions of Defendant.

At the July 2, 2003 hearing, the Court, after having considered all the testimony and evidence presented, found that Defendant Valenzuela was arrested roadside at the time handcuffs were placed on her and she voluntarily consented to go to the station with Agent Huerta.  The Court determined that Defendant Valenzuela was arrested prior to making any statements to the border patrol agents.

II.     **Discussion**

The Fourth Amendment provides that the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated . . . ."  The constitutionality of a border patrol stop is subject to Fourth Amendment scrutiny.  A detention is justified at its inception only if border patrol agents are aware of specific articulable facts, together with rational inferences from those facts, that reasonably warrant suspicion that the detained individual may be engaged in criminal activity.  *United States v. Brignoni-Ponce*, 422 U.S. 873, 884 (1975).  Each fact, however, must either be rationally suspicious in itself, or despite being innocent on its face, must be rationally suspicious when viewed in context with the other facts.  *United States v. Martinez-Cigarroa*, 44 F.3d 908, 911 (10th Cir. 1995).  A border patrol agent is entitled to assess the facts based on his experience in detecting criminal activity.  *Brignoni-Ponce*, 422 U.S. at 885.  The Supreme Court has outlined a number of factors to be used in determining whether there is a reasonable suspicion to stop a vehicle in a border area: (1) the characteristics of the area in which the vehicle is stopped; (2) proximity to the border; (3) usual patterns of traffic on the particular road; (4) previous experience with alien traffic on the road; (5) information about recent illegal border crossings in the area; (6) the driver's behavior, such as attempts to evade officers; (7) aspects of the vehicle,

such as concealed compartments; (8) appearance that vehicle is heavily loaded; and (9) other relevant information. *Id.* at 884-85. To determine what constitutes reasonable suspicion, courts must look at the totality of the circumstances to see whether the detaining officer had a particularized and objective basis for suspecting criminal wrongdoing. *United States v. Arvizu*, 534 U.S. 266, 273 (2002). The level of suspicion required for a brief investigative stop is less demanding than that for probable cause. *United States v. Sokolow*, 490 U.S. 1, 7 (1989).

Probable cause means "'a fair probability that contraband or evidence of a crime will be found.'" *Id.* (quoting *Illinois v. Gates*, 462 U.S. 213, 238 (1983)). Law enforcement officers may draw inferences based on their own experiences in determining whether probable cause exists. *Ornelas v. United States*, 517 U.S. 690, 700 (1996). As the Tenth Circuit stated:

> Probable cause to arrest exists when an officer has learned of facts and circumstances through reasonably trustworthy information that would lead a reasonable person to believe that an offense has been or is being committed by the person arrested. In the probable cause determination, we look at the totality of the circumstances of each particular case. *Probable cause to arrest does not require facts sufficient to establish guilt, but does require more than mere suspicion.*

*United States v. Vazquez-Pulido*, 155 F.3d 1213, 1216 (10th Cir. 1998) (internal quotations and citations omitted) (emphasis added).

In this case, the Court need not review the facts under the reasonable suspicion standard because the Court already determined that Defendant Valenzuela was arrested shortly after her initial detention. Defendant did not make any incriminating statements prior to the time she was arrested. Thus, the pertinent issue in this case is whether there was probable cause to arrest Defendant.

The United States relies on the following factors to support its argument that there was probable cause to arrest Defendant Valenzuela: (1) both the Cadillac and the truck driven by Defendant bore Arizona license plates; (2) Defendant Valenzuela and the driver of the Cadillac drove near each other for approximately 25 miles[1] on two highways in an area close to the border; (3) when Agent Lewis passed Defendant Valenzuela's truck, Defendant's left hand was covering her face; (4) after Agent Lewis pulled in behind the Cadillac and the Cadillac slowed down, Defendant Valenzuela passed the Cadillac rather than remain nearby to offer assistance; (5) the Cadillac was covered in dust as though driven on a dirt road; and (6) approximately 250 pounds of marijuana were found in the Cadillac. After a careful review of the sum of these factors, the Court determines that the border patrol agents did not have sufficient probable cause under the Fourth Amendment to arrest Defendant.

First, Agent Lewis observed that both the Cadillac and Defendant's truck bore Arizona license plates. While out-of-state license plates may be a relevant consideration in some instances, the Tenth Circuit has cautioned that "this factor in and of itself is not significantly probative of illegal activity and adds little to the reasonable suspicion equation." *Martinez-Cigarroa*, 44 F.3d at 911. In this case, Agent Lewis' suspicions were aroused due to several recent alien smuggling cases involving Arizona vehicles. The record is silent, however, as to how many recent border patrol stops due to illegal smuggling activity involved vehicles with Arizona plates and as to how

---

[1] The United States argues that Defendant's truck and the Cadillac drove together for 15 miles. After reviewing the record, however, the Court finds that the Defendant and the Cadillac driver drove in relatively close proximity to each other for approximately 25 miles: seven miles on Highway 11; eight miles on Interstate 10 from its intersection with Highway 11 to mile marker 79; and 10 miles to mile marker 69, at which point Defendant passed Agent Lewis and the Cadillac.

many Arizona vehicles on legitimate business are generally found in the Deming area.  Hence, the Court will give some, but not significant, weight to this factor.

Second, the government places considerable importance on the fact that the Cadillac and Defendant's truck drove near each other for approximately 25 miles in an area close to the border. This Court acknowledges that tandem driving may indicate criminal activity, *United States v. Ocampo*, 937 F.2d 485, 490 (9th Cir. 1991), and in fact, contraband was found in the Cadillac. Nevertheless, in this case there are simply not enough facts to demonstrate that Defendant was driving in tandem with the Cadillac and that Defendant's truck was the scout vehicle for the Cadillac.  When Agent Lewis initially observed the vehicles on Highway 11, two vehicles separated the Cadillac from Defendant's truck.  On Interstate 10, Agent Lewis spotted Defendant's truck a quarter of a mile behind the Cadillac.  The fact that the suspected scout vehicle was behind, rather than in front of, the load car mitigates against the use of the 'lead car-load car' inference.  *United States v. Escamilla*, 560 F.2d 1229, 1234 (5th Cir. 1977).  Moreover, a number of tractor-trailer rigs and other vehicles were between the Cadillac and Defendant's truck on Interstate 10.  Agent Lewis admitted in his testimony that, had he not seen Defendant's truck and the Cadillac driving near each other on Highway 11, he would not have made any association between them on Interstate 10.  While this Court must consider all relevant factors in its probable cause analysis, Agent Lewis' admission indicates that the quarter of a mile distance between Defendant and the Cadillac on Interstate 10 should not be afforded much weight.

The Court also does not place significant weight on Agent Lewis' observing Defendant's truck and the Cadillac on two separate highways.  While this factor certainly should be considered in determining whether the two vehicles were traveling in tandem, the factor carries less weight in

9

this instance because Agent Lewis acknowledged that Highway 11 to westbound Interstate 10 is the main route for northbound traffic going through Deming and destined for Arizona. Although the Court remains cognizant of Defendant's close proximity to the border when she was detained, the Court cannot ignore that Defendant was traveling in mid-morning on the main route used to travel through Deming to Arizona. Defendant was not attempting to utilize a seldom-used remote road to avoid detection.

As to Defendant's having the left side of her face cupped in her left hand when Agent Lewis passed her on Highway 11, the Court finds this factor to be *de minimus*. Agent Lewis testified that Defendant had her left hand against the left side of her face, with her elbow resting on the left windowsill of the truck. There is nothing in the record indicating that Defendant placed her left hand in this position to hide her face as Agent Lewis passed. Instead, it appears from the testimony that Defendant maintained this position as a way to relax while driving.

Fourth, the government argues that the fact that Defendant passed the Cadillac and Agent Lewis on Interstate 10 after Agent Lewis pulled in behind the Cadillac adds to the probable cause analysis. This Court is mystified by the government's assertion that acting "inconsistently with legitimate, tandem driving" is somehow evidence of tandem driving. *See* Pl.'s Br. (Doc. No. 64) at 5. The much more logical conclusion is that Defendant passed by Agent Lewis and the Cadillac because she was not driving in tandem with the Cadillac. Rather than support the government's argument, the Court concludes that this factor, if anything, detracts from a probable cause determination.

Furthermore, the facts that the Cadillac was covered by a fine layer of dust and that the Cadillac contained 250 pounds of marijuana do not add appreciably to the analysis of whether

10

there was probable cause to arrest Defendant because these factors do not link the contraband found in the Cadillac to the Defendant. *See United States v. Resendez*, 578 F.2d 1041, 1044 (5th Cir. 1978) (holding that, without first establishing a connection between Mercury and Cadillac, marijuana found in Mercury did not support finding of reasonable suspicion to stop Cadillac). The dust on the Cadillac cannot be connected to Defendant's truck because Defendant's truck was not covered in dust. Moreover, the marijuana found in the Cadillac does not add measurably to the analysis of whether there was probable cause to arrest Defendant when there is not more than a mere suspicion that Defendant and the Cadillac were driving in tandem. *See Vazquez-Pulido*, 155 F.3d at 1216 (noting that probable cause requires more than a mere suspicion).

Because of the tenuous link between the Cadillac and Defendant's truck, the United States' reliance on *United States v. Dominguez-Moreno*, No. 96-8093, 1997 WL 400046 (10th Cir. July 16, 1997) (unpublished decision), is misplaced. In *Dominguez-Moreno*, a confidential informant arranged to purchase drugs, informed law enforcement agents of the location of the drug deal, and gave the agents specific descriptions of the two vehicles that were going to be used in the drug deal. *Id.* \*\*1. The agents later observed two vehicles matching the descriptions given by the confidential informant near the location of the drug deal. *Id.* Because the agents had been informed that the drug dealer's practice was to carry a weapon, after stopping the vehicles, the agents immediately handcuffed the occupants. *Id.* The Tenth Circuit held that there was probable cause to arrest the defendant. *Id.* \*\*2.

The United States argues that the facts of this case weigh even more heavily in favor of finding probable cause to arrest than do the facts in *Dominguez-Moreno* because here the agents had actual knowledge of the large amount of marijuana in the Cadillac, "leaving no doubt" that

11

Defendant's truck was driving in tandem with the Cadillac.  Pl.'s Br. (Doc. No. 64) at 5.  The problem with the United States' contention is that in *Dominguez-Moreno* the court had significant evidence linking the defendant's and the drug dealer's vehicles together:  the confidential informant, who agents had worked with in the past, described with particularity the two vehicles that would be involved in the drug deal and the location and time where the drug deal was to occur.  In contrast, here there is much weaker evidence that Defendant's truck was traveling in tandem with the Cadillac:  both vehicles bore Arizona license plates and were traveling near each other for 25 miles on the main route leading through Deming to Arizona.

      Examining the totality of the circumstances, this Court cannot find probable cause to justify Defendant's arrest.  In other cases involving investigatory stops of vehicles suspected of being driven in tandem, a more objective nexus existed between the two vehicles than is present here.  *Cf. United States v. Pannell*, 2002 WL 72894, No. 00-10471 (9th Cir. Jan. 17, 2002) (observing that agents found cell phone agreement bearing name of driver of decoy car, and driver of drug car indicated that decoy car had been part of drug transfer); *United States v. Gomez-Espinoza*, Nos. 97-2302 & 97-2321, 1998 WL 537490 (10th Cir. Aug. 20, 1998) (noting that agent saw drivers of multiple trucks talking together before leaving); *United States v. Cantu*, 87 F.3d 1118 (10th Cir. 1996) (noting that reasonable suspicion existed when scout car turned around and headed back past checkpoint in a direction inconsistent with travel plans expressed by occupants of scout car).  Given that the probable cause standard required for an arrest is higher than the reasonable suspicion standard needed for an investigatory stop, this Court concludes that the border patrol agents did not have probable cause to arrest Defendant.  Accordingly, any statements made by Defendant after her arrest should be suppressed.

IT IS THEREFORE ORDERED that Defendant's Motion to Suppress Stop, Statements and Physical Evidence (Doc. No. 37) is GRANTED as to any statements made by Defendant after her arrest.

_____
CHIEF UNITED STATES DISTRICT JUDGE